***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Edward Garner, Jr., as well as the briefs and oral arguments of both parties. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence or to amend the prior Opinion and Award. Accordingly, the Full Commission affirms and adopts the Deputy Commissioner's holding and enters the following Opinion and Award.
 *********** STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. At the time of the injury sustained by plaintiff, an employer-employee relationship existed between plaintiff and the defendant-employer.
3. The carrier on the risk is correctly named above.
4. On September 4, 1998, plaintiff sustained injuries to the right knee and back. Defendants accepted these injuries as compensable.
5. The stipulated exhibits at hearing consisted of the following: Stipulated Exhibit 1 — stipulated medical records.
 ***********
Based upon the competent evidence of record, the Full Commission makes the following additional:
 FINDINGS OF FACT
1. At the time of hearing, plaintiff was a fifty-three year-old man. Plaintiff was working for Upstate Construction Company on September 4, 1998, when he sustained compensable injuries to the back and right knee. Defendants accepted these injuries as compensable. Defendants have paid, and continue to pay, temporary total disability benefits to the plaintiff.
2. Plaintiff underwent arthroscopic surgery on the right knee on November 4, 1998. Plaintiff underwent decompression at the two lowest levels of the back on May 18, 1999. Both surgeries were successful, although plaintiff continued to complain of pain. Plaintiff received follow-up treatment with Dr. DePerczel and pain management with Dr. Oberlin. Plaintiff has not received any treatment for his work injuries since June 18, 2001.
3. In August of 2001, plaintiff allegedly fell and spent the night outdoors. However, there is no evidence to indicate the reason for plaintiff's fall.
4. In August 2001, the office of plaintiff's attorney contacted Detective Doug C. Carter to check on the plaintiff. Detective Carter could not remember the date of the visit. Around 4:00 p.m., Detective Carter and a fellow officer found plaintiff outside his home sitting underneath a shed or cart. Detective Carter talked with plaintiff for about ten minutes in which plaintiff appeared coherent. Detective Carter did not see plaintiff stand or walk on that day in August of 2001.
5. On August 18, 2001, plaintiff was admitted to Catawba Memorial Hospital. Plaintiff's chief complaints were testicular swelling and weakness. Upon examination, Dr. William Price, the attending physician, noted plaintiff had severe swelling in his legs and abdomen. Dr. Price admitted plaintiff to the hospital with severe congestive heart failure. Plaintiff was treated aggressively with diuretics.
6. During his stay at Catawba Memorial Hospital, plaintiff was transferred to the psychiatric unit on August 29, 2001 due to his confused and delusional behavior. Plaintiff was transferred back to the medical unit on September 6, 2001, where he lost seventy-four pounds of fluid.
7. Plaintiff was discharged from Catawba Memorial Hospital on November 2, 2001, with a discharge diagnosis of ischemic cardiomyopathy, congestive heart failure, diabetes, and left leg deep venous thrombosis. Plaintiff was discharged to the Brian Center, an extended care facility where he was to receive physical therapy and placed on a strict diet.
8. Dr. Parker stated that it is important for someone with congestive heart failure, coronary heart disease, and diabetes to be treated through a program of diet, exercise, medications and regular follow-up visits with their family physician. In Dr. Parker's opinion, a patient's failure to do these things could result in devastating effects on their health.
9. Dr. Parker testified plaintiff had not seen a physician on a regular basis since his military service in the Vietnam Conflict. During his service, the plaintiff was a Prisoner of War for 38 months. After Dr. Parker diagnosed plaintiff with diabetes, plaintiff was treated with a restricted diet as well as Glucotrol. After the bypass surgery on June 5, 1996, plaintiff went through a cardiac rehabilitation program to which Dr. Parker monitored and received reports. Plaintiff's Monthly Progress Report on June 18, 1996, less than two weeks after his bypass surgery, stated that plaintiff was attending rehab sessions a little more than half the time, was not following his prescribed diet, and was intolerant to exercise.
10. A note from the licensed practical nurse at plaintiff's cardiac rehabilitation program stated plaintiff "has a complication every session, usually pain in chest." Plaintiff had completely discontinued rehab by August 26, 1996.
11. Dr. John DePerczel performed arthroscopic surgery on plaintiff's right knee on November 4, 1998. Dr. DePerczel also performed decompression at the two lowest levels of plaintiff's back on May 18, 1999. While the surgeries were successful, plaintiff still complained of pain in his back, his knee, and persistent weakness in his legs. Dr. DePerczel testified that there is no direct correlation between plaintiff's leg weakness and plaintiff's episodes of falling.
12. Plaintiff was referred to Dr. Deloy Oberlin by Dr. DePerczel. He treated plaintiff for pain in his hip and leg from February of 2000 until June of 2001. The last time Dr. Oberlin saw plaintiff was June 18, 2001, when plaintiff reported he had fallen and laid in the sun for five (5) hours. Dr. Oberlin had no opinion as to what caused plaintiff's fall of June 18, 2001.
13. Dr. Oberlin described plaintiff as a difficult historian who was dramatic in his complaints. Dr. Oberlin initially diagnosed and treated plaintiff for post-laminectomy syndrome based upon plaintiff's characterization of his pain. Dr. Oberlin declined to offer any causal link between the post-laminectomy syndrome and plaintiff's weakness. Dr. Oberlin testified there were numerous factors that played a role in plaintiff's pain and weakness including his back surgery, cardiomyopathy, a history of heavy smoking, inactivity, and depression.
14. Dr. Oberlin has no opinion concerning what caused plaintiff to fall on June 18, 2001. Dr. Oberlin stated that if an individual with back problems falls, "they generally get back up and go up the hill unless they break something and can't get up or they sustain paralysis that prevents them from ambulation in general."
15. Dr. William Price was the attending physician for plaintiff's care at Catawba County Hospital from August 18, 2001, through November 2, 2001. Dr. William Price does a lot of work with patients with congestive heart failure. Dr. Price first saw plaintiff on August 18, 2001. Plaintiff was grossly swollen, he had distension of veins in his neck and forehead, he had a grossly enlarged abdomen and liver, and his legs were swollen. According to Dr. Price, these symptoms were indicative that plaintiff had congestive heart failure. Further, plaintiff's ejection fraction was 10% while a normal ejection fraction is 60%. Plaintiff was admitted into the hospital with congestive heart failure.
16. During the first couple days of plaintiff's hospitalization, plaintiff lost fifty (50) pounds of fluid. By September 6, 2001, plaintiff had shed a total of seventy-four (74) pounds of fluid. After treatment and the loss of the fluid, plaintiff no longer had vein distension in his neck, his lungs were clear, his gout was gone, and plaintiff had no significant edema.
17. During the course of plaintiff's hospital stay, plaintiff had to be transferred from the medicine unit to the psychiatric unit. Plaintiff was transferred because he had become confused and delusional. Dr. Price saw plaintiff intermittently while he was in psychiatric care. When asked about the cause of plaintiff's delusion, Dr. Price testified that the volume of fluid that had to be taken off plaintiff in order to get him out of heart failure "could have caused some electrolyte shifts neurologically that could have precipitated him being somewhat delirious." However, Dr. Price also noted that when plaintiff entered the hospital, he was taking lithium, which is used to control bipolar disorder or some type of psychiatric illness.
18. When asked about the factors causing plaintiff's condition on August 18, 2001, Dr. Price testified that plaintiff's heart disease was clearly one of the factors. Dr. Price stated the second major factor was plaintiff's poor eating habits, especially eating foods high in salt. The third factor was plaintiff not being on appropriate heart medication.
19. Dr. Dale Menard is a neurologist who treated plaintiff from May 10, 2000, until December 12, 2000. Plaintiff complained of bilateral leg numbness and tingling in the calves, ankles and toes in both feet. Dr. Menard performed an EMG and nerve conduction studies that revealed plaintiff had axonal polyneuropathy as well as a pinched nerve in the surgical site. Further, Dr. Menard discovered plaintiff had not been controlling his diabetic sugar levels that contributed to his neuropathy. Dr. Menard opined that the polyneuropathy was not related to the original knee and back injuries of 1998 and that plaintiff's diabetes was the likely cause of the polyneuropathy. Dr. Menard testified that physical inactivity could increase glucose levels that may increase diabetic symptoms, however, the diabetic symptoms would not increase where a patient controlled his or her sugar through diet. Plaintiff's sugars and symptoms can be controlled in an inactive state. The numbness and tingling in plaintiff's toes, ankles and calves were caused by plaintiff's neuropathy. Dr. Menard testified that neuropathy does not normally make someone fall, although neuropathy can make someone trip over their toes and fall. Dr. Menard testified that if plaintiff were to stop treating his diabetes with diet or any medications, plaintiff would have a more rapid progression into neuropathy, nephropathy, and retinopathy.
20. Dr. Robert Iwaoka is an expert in cardiology. Dr. Iwaoka reviewed all of plaintiff's medical records in order to formulate his opinions regarding plaintiff's congestive heart failure. Dr. Iwaoka diagnosed plaintiff with ischemic cardiomyopathy. Dr. Iwaoka explained that plaintiff had a weak heart muscle and insufficient blood flow due to blocked coronary arteries.
21. Dr. Iwaoka explained that plaintiff's bypass surgery in 1996 did not reverse plaintiff's heart failure. Plaintiff's ejection fraction had significantly decreased from 26 percent, a severely damaged heart, to 10 percent, an end-stage heart. Dr. Iwaoka explained that once plaintiff's ejection fraction had reached 10 percent, it is almost impossible to reverse the damage. Dr. Iwaoka testified that the change in plaintiff's ejection fraction could also be caused by a progression of his underlying heart disease. While plaintiff underwent bypass surgery, the surgery does not correct the fact plaintiff suffered from diabetes and that plaintiff possibly suffered from cholesterol abnormalities. Dr. Iwaoka also noted that management of plaintiff's high blood pressure and diabetes could also play a role in the decrease in ejection fraction of plaintiff's heart.
22. Plaintiff's diabetes is a significant risk factor that can be correlated with plaintiff's heart condition. Dr. Iwaoka stated that diabetes is a risk factor that increased plaintiff's likelihood of heart attacks and can worsen one's cardiac prognosis. Dr. Iwaoka testified this increased risk is caused by progressive arthrosclerosis that is common in diabetics, especially uncontrolled diabetes. Plaintiff had a history of failure to comply with his medications, as well as a history of failure to seek cardiac and diabetic treatment, which can deteriorate the heart.
23. Dr. Iwaoka testified that plaintiff's condition could have increasingly deteriorated as it did even if plaintiff was exercising. Further, Dr. Iwaoka stated that due to the damage already sustained to plaintiff's heart, even if plaintiff had complied with his medications, sought regular cardiac care from a physician, and maintained an exercise regiment, plaintiff's condition could have still progressed to the congestive heart failure plaintiff suffered in August of 2001.
24. The undersigned finds that plaintiff did not maintain compliance with his diabetes and cardiac medications. The Commission finds that plaintiff did not comply with restricted diets recommended for control of his diabetes.
25. The undersigned finds that while plaintiff may have fallen in August of 2001 at his home, there is no credible evidence to suggest that the cause of the fall was related to plaintiff's compensable back or knee injuries.
26. In addition, the medical testimony establishes that plaintiff's heart condition worsened due to other factors, including non-compliance with medication, failure to obtain follow-up treatment for diabetes and cardiac condition, non-compliance with diet, and the progressive nature of his condition. Plaintiff's condition would have worsened to the point that it did, even if he had maintained an active lifestyle complete with regular exercise.
27. Plaintiff suffered from similar, if not identical, symptoms of fluid retention and congestive heart failure on July 6, 1997 (prior to his compensable injuries). Plaintiff was treated by Dr. Lowry on July 6, 1997, at Frye Regional Medical Center. Plaintiff was diagnosed with severe congestive heart failure, ischemic cardiomyopathy with severe left ventricle dysfunction, coronary artery disease, and diabetes.
28. Plaintiff's congestive heart failure and treatment from August 18, 2001, through April 4, 2002 was not the direct and natural result of plaintiff's compensable back and right knee injuries of September 4, 1998.
 ***********
Based upon the foregoing findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. On September 4, 1998, plaintiff sustained compensable injuries to the back and right knee arising out of and in the course of his employment with defendant-employer. Defendants accepted plaintiff's back and right knee claim as compensable. N.C. Gen. Stat. § 97-2(6).
2. There is no relationship between plaintiff's back and right knee injuries and the conditions, including congestive heart failure, for which plaintiff treated from August 18, 2001, through April 4, 2002. N.C. Gen. Stat. § 97-25.
3. Plaintiff is not entitled to medical compensation for his treatment from August 18, 2001, through April 4, 2002, related to conditions and complications arising from plaintiff's congestive heart failure and diabetes. N.C. Gen. Stat. § 97-25.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the undersigned makes the following:
 ORDER
1. Plaintiff's claim for medical compensation for treatment at Catawba County Hospital and the Bryant Center between August 18, 2001, and April 4, 2002, is hereby DENIED.
2. Defendants shall pay the costs.
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
 S/____________ BUCK LATTIMORE CHAIRMAN
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER